Okay, Ms. Smithy, whenever you're ready. Good morning. May it please the court, my name is Joyce Smithy and I represent Andrew Adams, the appellant in this case. Mr. Adams is a longtime employee of the Board of Education of Anne Arundel County. He began working there in 1979, has an issue in this case. This case involves a mix of issues under the Americans with Disabilities Act and the Family Medical Leave Act. The lower court's opinion focused on whether or not there were adverse actions to find violations of those two acts. However, it did not address two other issues, one under the ADA, one under the FMLA, at all in the lower court opinion. And I'd like to begin by addressing those. The first issue that was not addressed by the lower court's summary judgment was the issue of the reassignment to J. Albert Adams Academy and whether or not that was a reasonable accommodation. The lower court focused on whether or not that was an adverse action for purposes of the retaliation and discrimination counts, but there was no analysis done as to whether or not that was an adequate accommodation. There's no dispute in the brief that says that when reassignment or transfer is requested in accommodation, an employer is obligated to engage in that interactive process, identify vacancies, and if the person is qualified for those vacancies, transfer them to one that does not involve... I got the impression that your client wanted to go there. Isn't it witness in Dr. Wolf's recommendation that he said the client is not adverse to going to this particular location? You are correct. Dr. Wolf, who was the doctor retained by the school, did say that he wasn't adverse to it. Mr. Adams has not indicated that. And at the time, the initial request for the accommodation came in March. The transfer happened in August. At the time, there were no other alternatives presented other than him continuing at MacArthur where his own doctor had said... I don't see how you can complain about going to the school when he apparently wanted to go there. I don't think there's anything in the record that Mr. Adams wanted to go. There was something in the record, as you mentioned, that the school's IME doctor thought that... Can I follow up on that? Certainly. Because he was in pretty bad shape. And he was in a very stressful situation at his old school. And he had to take a variety of leaves. And if something wasn't done, I think his unfortunate condition would have worsened. And if the school hadn't done anything and hadn't arranged a transfer or something, they would have been accused of a failure to accommodate. You knew they would have... You can just see the EDA saying, here you are with an individual that is under a terrible state of stress. And you did nothing about it. Now, when he was transferred to JAA from MacArthur, the student body was one-tenth as large as the student body at MacArthur. And there was a much stronger, a much stronger faculty-to-student ratio than there was at the previous school. So, given the smaller number of students and the larger number of faculty, that would seem to me designed, reasonably designed, to have it did have the desired effect. And the school board does point out that he had opportunities to arrange a transfer from the JAA Academy, but he didn't take those. And as Judge Traxler points out, I thought that there were doctor's recommendations that the school board acted upon in order to arrange this transfer. I mean, what bothers me is it seems to me they were trying to help this person out. And that they were trying... If they knew he had a problem and that they were trying to do something beneficial. And so, it's kind of hard to smack them for that. I mean, it's like no good deed goes unpunished. I agree with your honor that a transfer was necessary and had been requested by his own doctor, Dr. Adler. And as you said, they were in a position where they had to do it. We don't dispute that at all. The issue then is once they became on notice that there had to be a reassignment or transfer, whether or not they did all that they're obligated to do under the ADA to ensure that that was to an equal position. So, I agree that they had to do the transfer, but the person, Dr. Liverman, testified he made no consideration of any opportunities, conceded that there could have been, but selected one that had a diminution in pay, made him ineligible for bonuses. I thought the diminution in pay was due to the fact, I thought his salary was the same at JAA that it was at MacArthur for the first two years. And then there was a diminution of pay, but I thought that that diminution of pay was a product of the collective bargaining agreement between the school board and the teachers union. I didn't think that this was some act on the part of the school board, and I really didn't think it until he had been at JAA for two years. It's correct. The position had a diminution in pay, and because of the collective bargaining agreement, it didn't take effect for two years, and then it did. However, it also rendered him ineligible for certain bonuses that he would be eligible for at the school he had been in, in addition to that. So, there was a diminution that was put off for two years because of the CPA. Bonuses, of course, were not guaranteed or even stipulated. But, I come back again to the fact that Mr. Adams seems to have done well at JAA. His problems, fortunately, seem to have receded. He never requested a transfer. He had the opportunity to request a transfer. Once again, the population of this other school was less than 10% of MacArthur. It's a lower stress school, two doctors wanted him to go, made a recommendation that he go. What's the school board supposed to do? I would say that what the school board should have done, again, Dr. Adler, I agree, said there needed to be a transfer, should have been looked for all available opportunities, including those that would never have had a diminution of pay or render him ineligible for bonuses, and make those and engage in the interactive process. Instead of saying, we're not going to look for anything, they picked one. And the record does have this is a school, you know, the stress that he had been under involved student assault upon him and how he handled that. The school that he was sent to is a special school. It's an alternative middle school for students who are disciplinary issues, had problems with the police. How long has he been there? I believe now four or five years, I believe, four years. That sounds like a pretty stable situation. Has he ever requested a transfer to any of these other places? I do not believe that's in the record, although I would say a jury could reasonably conclude that, you know, he didn't. The reason he hasn't sought one is because of the history of retaliation. Did he ever object to going to JAA? There's nothing in the record that he did object. It was the only option given to him. There was no other option picked. With regard to the change in pay, was that set when he was transferred? In other words, was it a matter of collective bargaining agreement or whatever, or is this something that occurred or changed after he got to JAA? No, they knew at the time of the transfer that it would result in a diminution in the salary and benefits. Everybody knew that, and then the CBA essentially stayed that for two years for lack of a better term. You know, you keep talking about the bonus. The bonus is also part of the collective bargaining, but salaries are determined by the number of students in the school, and so if you're trying to put him in a less stressful environment, obviously less students, it's going to be a diminution in salary because it's a smaller school. And I don't disagree with that. I think the issue is that the obligations of the employer under the interactive process was to identify all options, and they failed to do that. There was no interactive process. They selected one that did involve that. They admitted in the deposition that they didn't even try to consider any other options, and they had a duty to do so. That's where the problem came in, where he was given no other options but this one, and an objection could have meant going back to the school that triggered the panic attacks and where the incident had occurred to the student. And they selected another option, and there's additional unfortunate panic attacks, and then there's more litigation. And I think Plano's situation is very unfortunate. I would never make light of it, but I think the school boards sometimes find themselves between a rock and a hard place, where they're, you know, darned if they do, and they're darned if they don't. There's a situation in which they could have avoided any litigation by simply identifying and talking to him about any vacant positions instead of only choosing one. But they might have been willing to give, to engage in this if he'd either objected beforehand or requested a transfer afterwards or what have you. That's the whole thing. There wasn't anything he did that would have put this interactive process in motion if there's no objection and there's no request for transfer. Particularly when you have on top of that the statement from Dr. Wolfe that he's not adverse to going there. So if I'm a school district, I read this, he's not adverse to going there, say you can go there, he doesn't object, he says it's okay to go there. I just don't know what would alert the school board to a duty to do more. That the school board, I would say that the school board had an obligation before that one school was identified to identify all of the possible vacancies instead of only one. The interactive process is not only imposed upon the employee and in fact we've included case law, we've talked about the Crable case we talked and then there's third case, so third circuit case law, seventh circuit case law that says when there's a reassignment at issue, the interactive process burden falls heavily on the employer who's more aware of where the vacancies may be coming up or what may be out there. And in this case, you know, while I hear argument that there wasn't part of the interactive process on Mr. Adams' part, there was none on the employer's part. What about the doctor's letters? Dr. Adler simply requested a transfer or reassignment. He never came in and said this one's okay. It was their own doctor that they had hired to perform the evaluations who came in and said that he thought that the J. Albert Adams Academy would be sufficient. Even today, is there another school you can show us or the school board that would have been better? Not that would be in the record, sir, and I don't know the answer to that question. All right, thank you. Well, you've got some reply time remaining. Let's hear from Mr. Reach. If it pleases the court, Jake Reach for the Anne Arundel County Public School System. I appreciate the opportunity for appearing here today. I believe that we're in a situation where it is Mr. Adams' misperception of events that is creating, in part, a difficulty here. He has admitted in the record that he has an issue concerning perception. I would reference the court to his comments about snide comments that he thought he was going to receive from Mr. Farrar, and that's on page 271 through 273 of the extract. It is replete in here that he has a problem with relating the facts, and specifically on the February 24, 2010 meeting, this is a crucial meeting where he is meeting with the investigator, and he believes that, according to his affidavit completed on November 2013, that all the allegations rolled out and there's no improper behavior yet. At that point in time, the investigation was continuing. How do we know? Because at that point in time, he submitted and gave a written statement, or gave a statement to the investigator, Sarah Zack, and that is in the record in extract 602. Now, previously, Mr. Adams had been deposed, and he indicated he was shown some resolution documents and asked if the investigation was continuing, and he said he didn't know the workings of the court. So it's clear that his mindset about this is evolving. Well, is it fair for him to assume that when the social service investigation was concluded and he was reinstated to the same job he had, is it reasonable for him to assume that the Board of Education inquiry had ended too? I don't think it was reasonable, and the reason is because he had a meeting on November 24, where he was shown, where he was told the DSS investigation was concluded, and they interviewed, the Board interviewed him. That should indicate to him that it was not concluded, that their action was going forward, after he was shown a document saying it was concluded. Well, I got lost in the appellate's argument. I thought, complained about the Yes, that's correct. From the February 24th meeting, the Board of Education continued its investigation, and then finally it decided to issue him a written reprimand. Now, that's, it's kind of interesting because the written reprimand, Mr. Adams believes to have accused him of child abuse, but if you were to take a look at the record at page 180, it specifically states, this letter serves to give you notice that your actions were unacceptable and provide you with the opportunity to correct your inappropriate conduct. Specifically on January 19, 2010, while attempting to obtain a cell phone from a student, you engaged in physical contact by using a technique that escalated the situation and could have been handled differently. There's no indication of child abuse here. Well, you know, I think Judge Floyd makes a good point about the fact that there were an awful lot of investigations here, and maybe they were, you know, overlapping. It does seem to be a lot of investigations, but as I understand it, the investigations have different focuses. One has to do with simply child protective focus, which is a child abuse question, and the other has to do with the compromise of the school's educational mission, at least as I understand that those were the different focuses. Yes, Your Honor, that is accurate. So, this was the kind of incident where, you know, there were two sides and the eyewitness accounts varied and everything, and it was a very unfortunate incident, but it wasn't, there were much more serious ones, and what I am concerned about is that in cases where students are seriously sexually assaulted by faculty or whether they are sexually molested or whether they're physically or mentally damaged, far greater than that inflicted on students. I'm worried about hampering the ability of a school board to get to the bottom of those, both from the standpoint of protecting the child, but also from the standpoint of making sure that the educational mission is not going to be incident than this one comes up. I wouldn't want this case to stand for proposition can only do one investigation or whatever. You have to look into it or you're going to have the public and parents and school board and everybody else jumping down your throat. Yes, sir. It's the school's mission to both protect the students and to protect the faculty. So what we, what's in the record, and I can't point you out to a specific page, but Mr. Liverman testified that what they do with the investigation is they go forward with Department of Social Services investigation and the school board doesn't interfere with that. And then when that is concluded, they go forward with their investigation, which is basically a policy or procedure type investigation. Did you do something wrong in terms of policy? I understand the school board's position on that, but it did seem to go on quite a long time. Couldn't this matter have been wrapped up and concluded? You know, investigations take their toll on people. And couldn't this matter have been wrapped up and concluded more promptly than it was? There were all sorts of things. Why did it drag on? I don't know what that has to do with the Family and Medical Leave Act. Because we don't have a general warrant to supervise the school board's investigatory process. So I don't know. The Family and Medical Leave Act thing, it's a moving target. I don't understand what exactly the It was this, it was this, it was this. But he had lots of leave. Yes, and he utilized it. Yeah, he wasn't denied leave. But, I mean, it doesn't relate to the FMLA violation necessarily, but why did it take this long? And, Your Honor, I really can't answer that. I don't know why it took from the date of the incident, which was January 19th to the 24th, when they brought him back. But apparently that was the Department of Social Services portion of the investigation. And when they brought him back... But he had an attorney at these proceedings, didn't he? He did have an attorney at... And the attorney requested continuances, or a continuance. He apparently requested one continuance when he was, when they did a predisciplinary meeting. And that was four days. So I really wouldn't say that was significant. As I say, whether you consolidate the investigations or how long they took, I don't know that that has any relationship to any statutory violation that we have the authority to correct. But it does seem to me, you know, unfortunate sometimes that investigations go on and on and on. And they do take their toll on individuals. And, as I say, that doesn't relate to the FMLA violation. But still, it's unfortunate. The question seems to me simply is whether an unwarranted investigation is an adverse form of action. Was it unwarranted? Your Honor, I would say it was not. They found that he shouldn't have engaged in their contact with the student. It was a violation of the school policy. Therefore, I would say it was not unwarranted. There is nothing to indicate that the school did that on a pretextual basis or anything like that. I think it's quite direct that the school's action here was specifically concerning the incident. Now, Mr. Adams can. And Mr. Adams has other misconceptions about what was going on. The first, what was the school attack on March 3rd where he's sitting on the floor and Mr. Farrar comes in and he says, I told Mr. Liverman I didn't want to come back. And Mr. Farrar says, I don't know what your problems are. We have enough chaos in the school. Call Dr. Chiafani for a transfer. I mean, that seems to be like engaging right there if you have a problem. And he was given leave that day. I think it's critical to point out that the appellant says he was denied medical help on that day. And he wasn't. Sarah Eager was looking for a nurse even after Mr. Farrar went to talk to him. And Mr. Adams doesn't recall asking for any medical assistance of Mr. Farrar. And that's on page 280. The second verbal attack on March 8th was even more benign. While you were gone, people were covered for you. And you hadn't communicated your absence. I would suggest to you that they seem to be, that Mr. Adams seems to be particularly concerned with what people think of him. And I think that that is contained within his comments on page 272. Is there, with respect, because I think part of the question about investigations and adverse effect, normally we look at these questions procedurally. And if due process was observed, then it's much less likely to be an adverse employment action. But are there any due process violations in the investigations that are alleged? Was this person not given a chance to present his case fairly or to assemble his evidence or make his case? There's certainly no suggestion of that. He was entitled to and gave a statement to the investigator on the 24th. With the pre-disciplinary hearing, he was unable to prepare any response and he came in with an attorney at pre-disciplinary meeting, stated his case, and it was only after that that there was a disciplinary letter sent out saying that this is a written reprimand. It didn't amount to anything because ultimately he didn't engage in that conduct again and he continued to be an outstanding employee. This is one incident where he crossed a line, where he violated policy. They told him that he violated policy and he's actually acted as principal since then over at the JAA Academy. He has gotten outstanding evaluation and as your honors have noted, he seemed to fit in there. Excuse me. Finish your statement. I just wanted to ask you a different question. He hasn't had a problem at that location. Other than the two occasions he indicated he was either threatened or assaulted and there's no way we can imagine what's going to happen in the future. Would you look at page 184 of the joint appendix and tell me if the defendant ever signed that document? 184. I know that document. I can say he probably did, but I cannot say that I have a copy of it. I mean, that's the normal process is they are given a letter indicating that they are reassigned. I was going to say it notes that the change in his position will result in a salary change in light of the new position. I'm just curious whether or not he ever signed the document to acknowledge or is there proof that he received this notice that his salary was going to change? He at least received notice that his position was going to change, that he was going to be vice president. Because his salary is going to change. That's correct. That's correct. And I cannot say for sure. I'm certain that in his deposition he acknowledged that he knew about the salary change, but I don't know about the specific document. I would indicate on the FMLA interference issues, he was on, he had a note saying he was on temporary medical leave from Dr. Adler which was received from the school on 3-29. They sent out the predisciplinary meeting letter on 4-12 indicating it would be three weeks hence. Perhaps that's the delay that we're talking about. Because he wasn't there and they were setting up a predisciplinary meeting in the future to accommodate him. I don't know. It was only on April 15th that we received FMLA paperwork saying he needs to be out. And he needs to change. There was no indication that the, his FMLA leave was interfered with or harmed in any fashion as a result of attending this meeting. He did have to attend three medical appointments, but that was all encompassed within the scope of the one evaluation from Dr. Wolfe. The school board didn't say he had to go to three medical evaluations. The school board said, we want you to be evaluated by Dr. Wolfe. Apparently, after talking with Dr. Wolfe, he needed to have the follow-ups in order to complete his evaluation. He has an independent contract. We can't control that. And it was only necessary to seek cooperation about a doctor's note. And it provided that information. It provided the fact that, indeed, he needed to go to another school. Indeed, he needed a less stressful environment. And when the time came to talk about that less stressful environment, Dr. Wolfe states that he talked to him and says, Mr. Adams is not adverse to the possibility of being assigned to a specialized program such as the J. Albert Adams Academy, which has been mentioned as a possibility. It doesn't indicate that this was the only possibility or that all other things are foreclosed. But this was a possibility that the school system, an open position, 10% of the students that really fit for the situation. I think we've been over all of this. Well, then to summarize, I would indicate that the public school hasn't taken any adverse employment actions against him, that the investigation was of a continuing nature, and finally resolved that the written reprimand never resulted in any significant detrimental effect and that the determination to move Mr. Adams to the J. Albert Adams Academy was for his benefit. The plaintiff's theory that the employer must look for every possible opening or that they must evaluate one and find one with equivalent pay is not supported. All of the cases that Mr. Adams has come forward with, McLean, Thompson, and Rea Zulin, all of them indicate that when they get to the point of the employee disputing that there's a reasonable accommodation, he has to point out that he is qualified for this other position. And that did not occur in this case. I would suggest that if we reached past the prima facie case, that there are legitimate non-discriminatory reasons that have been placed on the record, that there is no proof that the legitimate non-discriminatory reasons are unworthy of credence and pretext. I would respectfully ask the court to affirm. Thank you. Ms. Smithy. I'll shift this portion of my argument to addressing the allegations of child abuse and the fact issues there. Mr. Adams' position is that he was told in a meeting that he had been cleared and he had been shown a letter that has not, it's not part of the record because it wasn't produced in discovery, but he did see it, that had the unanimous decision of all five members of Dr. Liverman's committee saying he had been cleared. Also, Dr. Farrar, the principal, who's been accused wrong during the case, admitted in his deposition that he had received a phone call prior to Mr. Adams' return to the school in which he was informed he had been cleared of all the allegations and Mr. Adams was allowed to return to the school. The school system argues that it was a continuing investigation, so there's a dispute of fact there. The lower court relied almost exclusively on a snippet of deposition testimony from Mr. Adams in which he was, whether or not he had personal knowledge of whether the investigation was going on at the time he showed the document. He was not personally involved in the investigation. However, if you look at the depo testimony right before that, and it's in the record at 304, Mr. Adams was quite clearly testifying that he had been shown a letter, that it had not been produced in discovery, that it had the five names of Dr. Liverman's committee and said unanimous and had said it was cleared. So he has not changed his testimony that had already been testified to and then when he testified that he did not have personal knowledge, he wasn't the person conducting the investigation. Let me ask you this. Yes. I don't understand how the investigatory process, as long as due process was observed, I don't understand how that relates to an FMLA violation. If an employee was given FMLA leave and didn't suffer a diminution of allowed back on the job and everything, it means school boards have a variety of investigative structures and maybe some of them are better than others and some of them have, they may give rise to state law claims or internal grievance claims. I don't know what. But how does this relate to an FMLA violation? Sure. We would certainly agree that they have an obligation and had in this case an obligation to investigate. And that he was interviewed and after he was interviewed and their own log says it's his completing report right after he's interviewed and it's only after they learn of the FMLA activity that it gets reopened, after there had been a determination. So due process had to occur and did occur and what the issue is is that after the protected activity begins, they reopen an already decided case and then issue a reprimand when it was already previously cleared. And in looking at the case in pretext, the issue is whether or not the proffered reason given by the school system is more likely than retaliation by the FMLA. In this case there are numerous sites in the record towards hostility towards Mr. Adams taking the FMLA leave. You have both of the other assistant principals having testified that the principal was making comments to them, that he was playing games with his sick leave and the principal does not have any medical degree to disagree with Mr. Adams' doctors, that he was expressing frustration that Mr. Adams was out on leave and in fact when Mr. Adams was on the floor and he was unable to breathe. Was this investigative structure different from what was normally followed? If you look at the testimony from Mr. Liverman in his deposition, he said the usual procedure is that they issue a resolution document as soon as they get the CPS resolution. He did testify that on some occasions for serious altercations they may go on, but he testified usually they get that and then on most cases they then issue their own closing out resolution document which is the document we contend was shown to Mr. Adams and that they acted on that document in calling Mr. Farrar who is an adverse witness who admitted he got the call saying that he had been cleared of all allegations. In your brief you referred to a number of actions that you believe constituted interference under FMLA. What is your definition of interference with FMLA rights? It would be forcing the employee to perform work larger than the de minimis kind of calls that have been allowed by the case law. What about Mr. Farrar's actions toward him when he returned to work? Is it your opinion that constitutes interference under FMLA rights? There's case law that says when an employee is subjected to an adverse action upon return that that also constitutes interference and then it also goes into retaliation. So there is case law that says that, that you are interfering with rights if they have to go and fear that they're going to be punished in this way. But most of the case law in the Fourth Circuit has interference being interfering with their right to take the medical leave and in this case calling him in for a disciplinary conference which is larger than the de minimis calls and something that he should have been on regular pay instead of being forced to incur leave benefits for while he was going to this disciplinary proceeding. Employees are paid when they're required to go to discipline meetings. So in this case, to sort of continue where the, on the pretext issue, we had Mr. Adams laying on the ground unable to breathe. There's been some allegations he didn't ask for medical help when someone's laying on the ground having difficulty breathing which is not contested. That ought to be enough to be, to put people on notice that somebody might need some medical help. But Mr. Farrar, you know, Mr. Adams clearly testified that he said we don't have time for your games and that's not even a disputed fact. Mr. Farrar himself sent an email that is in the record that said I saw him on the floor, I saw him unable to breathe, I told him that we don't have time for you to play your games and get up and leave. This shows hostility towards Mr. Adams and his disability and the fact that he, you know, needed these leaves because of it. All of those facts together could certainly cause a jury to say, well, we have to decide, was he in fact given through all the due process, there's not a due process issue here, but all the investigations were done. Mr. Adams was told that, Mr. Farrar was told that, their own witness, but they claim it wasn't done until May, which is over four months after the incident. You know, there is no explanation in the record for why nothing really happens and then it kind of breathes life into an investigation. There are only two witnesses that are interviewed after the protected activity occurs and both of them had submitted written statements and they're both favorable to Mr. Adams. There's the one from Ms. Bene, who's a teacher, who was actually on the scene before Mr. Adams and described that he was calm, she didn't see him push or shove the student, and then there's another statement from Mr. Rieger, another teacher who witnessed it, who said he observed no physical contact whatsoever and he described himself as being on the scene immediately. Both of those written statements were in the investigation prior to them telling Mr. Adams he had been cleared. They went and interviewed them. The interviews were consistent with everything that they had said in the written report and then the determination came out differently from what he had been told prior to engaging in the protected activity. So I see my light is on and I'll stop unless there are any further questions from the court. No, I think we understand the position. Thank you.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Henry F. Floyd